IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 20–49–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| TAYLOR RAY BOGARD, | |
| Defendant. | |

Before the Court is Defendant Taylor Ray Bogard's Motion to Suppress. (Doc. 18.)  On March 10, 2021, the Court held a hearing on the motion.  For the following reasons, the motion is granted.

## BACKGROUND[1]

Bogard's car came to rest on the front law of a residence near the intersection of 39th and Reserve Street after it hit a retaining wall, crashed through a chain link fence, and struck a tree.  Moments before, Bogard was leading Missoula Police Department Officer Casey Harvey on a high speed chase down Reserve Street with speeds, at times, exceeding 100 miles per hour.  Attempting to

---

[1] The facts are derived from Officer Harvey's bodycam footage and case report, Officer Potter's bodycam footage, Officer Suazo's case supplement report, and the testimony of Officers Suazo, Gaxiola, and Potter at the Court's suppression hearing.

1

evade the officer, Bogard turned onto 39th and lost control of his vehicle.  It was sometime after midnight on February 8, 2020.

Shortly after coming to a rest, Bogard swallowed a half gram of methamphetamine and then fled on foot towards an elementary school with Officer Harvey in close pursuit.  The officer lost sight of Bogard as he approached the school grounds, but quickly found him lying down in an open field.  As Officer Harvey's flashlight swept the field, Bogard returned to his feet and took off running.  Officer Harvey quickly caught up, and with backup starting to arrive, he and others tackled Bogard to the ground and placed him in handcuffs.  Multiple patrol cars and officers were now on scene.

Bogard was out of it.  Although he did not have any obvious external injuries from the crash, he was swaying and unsteady, and the officers decided to transport him to St. Patrick's hospital for an evaluation and toxicology blood draw.

Meanwhile, at the crash site, Officers Berger and Suazo had determined that Bogard was on felony probation.  Officer Suazo called the 24-hour probation hotline, and Probation Officer Joe Gaxiola answered.  Officer Suazo relayed the circumstances of the chase and crash and told Gaxiola that he could see drug paraphernalia through the windows of Bogard's car.  Without consulting Bogard's conditions of probation, Officer Gaxiola authorized the search of Bogard's

vehicle—which ultimately uncovered a stolen Ruger handgun, drugs, and drug paraphernalia.  The gun was loaded.

At roughly the same time, Officer Rebekah Potter was getting ready to transport Bogard to the hospital.  She was given a zip lock bag with some of Bogard's belongings in it, including a wad of tinfoil.

"Heroine?" she asked another officer.  He told her that Bogard had made a "spontaneous utterance" that it was methamphetamine.  He also told her that Bogard had not yet been mirandized.

As they were headed across town, Bogard asked Officer Potter whether this was "going federal?"

"Going federal?" she asked, not sure whether she had heard him correctly. "For what, bud?"

Bogard responded inaudibly and Officer Potter told him she didn't think so.

She pulled into the hospital's sally port and helped him from the vehicle into a wheelchair.  Then, she asked for his consent to a blood draw, to which he agreed. By this point, it became clear that something was wrong.  Bogard was sweating and his breathing was labored.  Officer Kamerer, who had followed Officer Potter to the hospital, asked Bogard whether he had taken anything.  Bogard said that he had injected and swallowed meth.

3

The officers were told by hospital staff that they would have to stay put because the emergency room was full.  Officer Potter requested that someone check Bogard's vitals.

"Were you wearing a seatbelt?  Did you hit your head?" she asked him.

Within moments a nurse came out and consulted with Officer Kamerer on the situation.  When the nurse found out that Bogard had eaten methamphetamine, he arranged for Bogard to be seen immediately.  The officers escorted Bogard inside.  He was brought into an examination room and situated in a bed, while the nurse questioned him about his meth use.  Bogard explained that he had ingested "about a gram."

"Was that different from what we found in the foil?" Officer Potter asked, attempting to clarify the total amount of meth he had consumed.

Bogard nodded.

"I just don't want you to be confused," she said.

The nurse helped Bogard lean back onto the bed while the officers adjusted his handcuffs.

"I was going to shoot you guys," Bogard told Officer Potter.

"You have a gun?" she asked.

Bogard shook his head.

"What were you going to shoot us with then?" she asked.

4

Overhearing this exchange, Officer Kamerer said that the police had found a stolen gun in Bogard's car.

"How did you know it was stolen?" Bogard asked him.

"We ran the serial number."

Bogard didn't respond.

Officer Potter asked Officer Kamerer under her breath whether Bogard had "just confessed to something else?"

Officer Kamerer seemed to confirm.  "It'll go federal," he said.

Officer Potter then understood Bogard's question in the car.  She told Officer Kamerer about the exchange.

"Your bodycam still running?" he asked her.

Officer Potter confirmed that it was.

The officers stood back while Bogard was treated.

When everyone left the room except Officer Potter, Bogard began to talk. First, he asked her whether his face was messed up.  She told him it wasn't.  He thanked her for arresting him and then told her about his mother.

The conversation continued as others came and went from the room.  Officer Potter stepped out to her car briefly to look something up on her computer.  It was then that she realized she had been to Bogard's house on a drug raid back in November.

5

When she returned to his room to wait for the blood draw, Bogard started talking about the accident, how his odometer had read 110, and how he had lost control attempting to turn.  He said he had felony charges for grand theft auto and burglary and told her that he had been trying to stay sober and had relapsed only today.

"I was at your house in November.  Have you been clean since then?" she asked.  Bogard nodded.  He looked at the ceiling and continued his soliloquy— how he struggled with sobriety and feelings of worthlessness.

"There is no amount of help I can get that I won't take—" he fell silent.

"To stay clean?" she asked.

Bogard confirmed, and then continued to reflect on his situation, calling himself "dead in the eyes of the devil."  "I feel kind of free now," he told her.  "I was so worried about the feds coming to get me."

When Officer Harvey arrived, Officer Kamerer stepped outside of the room to update him, and Officer Potter reported that Bogard had been "chatty."

"Tell my wife, I'm sorry," Bogard said.

"Who's your wife?" Officer Potter asked.

Bogard told her about their relationship but said he felt it was coming to an end because he was a "dead man walking" and would be facing "15 years."

6

As Officer Harvey came back in the room, Bogard started talking about the accident again, and how in the moments after the crash, he looked at his backpack and wanted to grab the pistol and start shooting.

Officer Potter approached Harvey, and the two spoke quietly about Bogard's "spontaneous" statements.

Bogard then mentioned something about his work, and Officer Potter asked where he worked.  When he told her, she responded, "that's right.  I knew that. We went looking for you there in November."

This turned the conversation back to the police department's raid on Bogard's house.

"What did you guys end up finding at my house?" he asked.

"Drugs," she said.

"Was there a spoon?  A big spoon?"

Officer Potter laughed, "Full of meth?  Yeah."

Bogard told her about all the drugs at his house back in November, and then turned back to the accident.  "This is the first high speed chase I didn't get away with."

"You got away with a bunch of others?" she asked.

"No," he said, but then started to describe an accident that resulted from drinking and driving.  The two continued back and forth—Bogard clearly

7

comforted by Officer Potter's sympathetic ear as he described his drug habits, the people he wanted to hurt, and his prior felony convictions.

Eventually, Officer Potter obtained her blood draw and left the hospital, leaving Bogard in the custody of Officer Harvey.  With Potter gone, Bogard turned to Harvey.

"What am I looking at, boss?" he asked.

Officer Harvey was noncommittal.

Bogard then started listing off the crimes he thought he had committed— evading a police officer, resisting arrest, reckless driving, possession.

 Officer Harvey did not respond at first, but then said, "I'll chat with you about it, but I have to read you your Miranda before I can."  Once read, the officer verified that Bogard understood his rights, and asked him again whether he wanted to talk.

Bogard thought for a moment.  "No," he said.

Bogard was subsequently charged in federal court with one count of being a prohibited person in possession of a firearm and ammunition.  This motion follows.

### DISCUSSION

Bogard moves to suppress the gun and his confessional statements at the hospital.  He argues that his Fourth Amendment rights were violated by the search

of his car and that his statements should be suppressed because they were obtained in violation of Miranda.  As explained below, the Court agrees on both counts.

## I.  The search of Bogard's vehicle was not authorized by any probation condition.

Bogard argues that Officer Suazo's search of his vehicle violated his Fourth Amendment right to be free from an unreasonable search because: (1) there is no evidence that Officer Gaxiola ever authorized a probation search; (2) this was not a valid search incident to arrest; and (3) Bogard was not subject to any operative probation search condition.  (Docs. 18 at 4 n.1; 19 at 2–3.)  The Government does not defend Officer Suazo's warrantless search of Bogard's vehicle as a search incident to arrest.  Its sole argument is that the search was a lawful probation search given Officer Suazo's reasonable suspicion that Bogard was in possession of drugs.  (Doc. 23 at 3–6.)

The Court need only address Bogard's third argument which is dispositive of the issue.  At the time of his arrest, Bogard was not subject to any conditions of probation.  Although the Fourth Amendment is tolerant of warrantless searches supported by reasonable suspicion when authorized pursuant to a valid probation search condition, *see United States v. Knights*, 534 U.S. 112, 119 (2001), no such condition was imposed in Bogard's case.

Bogard was initially sentenced in Lewis and Clark County by District Judge Menahan for felony burglary and misdemeanor reckless driving on March 15,

9

2017.  (Doc. 18-5.)  For the felony, he received a three-year deferred sentence.  (*Id.* at 2.)  Bogard's ability to remain on a deferred sentence required him to abide by 18 conditions imposed in the judgment, including a search condition.[2]  (*Id.* at 4.)

On July 20, 2017, Bogard was brought back before Judge Menahan on a revocation after violating the conditions of his supervision.  (Doc. 18-7.)  Judge Menahan revoked his three-year deferred sentence on the felony burglary count and sentenced Bogard to "the Montana Department of Corrections for a period of ten (10) years, with seven (7) years suspended, upon the following conditions:"— however, that next portion of the judgment where the conditions would normally appear is left blank.  Instead, the judgment goes on to read that "[t]he sentence imposed for Count VIII—RECKLESS DRIVING, was not addressed and/or revoked by the Court."  (*Id.*)  No other conditions were imposed anywhere in the judgment, which instead states that "[t]he Court recommends all previously imposed conditions of a defendant's sentence remain in full force and effect should defendant be granted an early release."  (*Id.*)

---

[2] This condition stated:

> Upon reasonable suspicion that the defendant has violated the conditions of supervision, a probation and parole officer may search the person, vehicle, and residence of the defendant, and the defendant shall submit to such a search.  A probation and parole officer may authorize a law enforcement agency to conduct a search, provided the probation and parole officer determines reasonable suspicion exists that the defendant has violated the conditions of supervision.

(*Id.* at 4.)

Reviewing the judgment, it's clear that the omission of any conditions of supervision where such conditions are expressly contemplated (as evidenced by the judgment's reference to a seven year suspended sentence "upon the following conditions:") was error.  Nevertheless, it's an error that was apparently not caught by the court or the county attorney at the time of his revocation.  The court's "recommendation" to impose the previous conditions is similarly ineffective.

On December 18, 2019, Bogard was released into the community.  Probation Officer Gaxiola, who had access to Bogard's probation file, testified at the hearing that on December 23, 2019, Bogard met with Tara Cattell, his supervising officer. Officer Gaxiola explained that this is typically the meeting where the probation officer goes over each of the conditions of supervision.  Officer Cattell's notes from this meeting, which Gaxiola read into the record, do not indicate whether this occurred.  Nevertheless, it is reasonable to assume that Bogard was under the impression that his ability to remain in the community was dependent upon certain conditions, because his records indicate that he was in regular contact with Officer Cattell and he agreed to attend 90 Narcotics Anonymous meetings in 90 days.  No one—not Bogard, Officer Cattell, nor Officer Gaxiola—realized that Bogard was not, in fact, subject to any conditions of supervision.

Where a defendant is not given conditions at sentencing, Montana law provides a solution.  By statute, the Department of Corrections may request a

11

hearing so the sentencing court can set conditions of probation after-the-fact. Mont. Code Ann. § 46-23-1011(1) (2019).  Presumably to protect the probationer's right to due process, the statute requires that the probationer be present at any hearing where conditions are imposed and grants the probationer the right to counsel at that hearing.  *Id.*  Because no one caught the error in Bogard's case, no such hearing was held.

So, when Officer Suazo contacted Officer Gaxiola on February 8, 2020 and obtained his permission to search Bogard's vehicle, there was no operative condition that allowed Officer Suazo to conduct a warrantless search on reasonable suspicion that Bogard was in violation of the law or a condition of his supervision. Officer Gaxiola explained that when he authorized the search, he did not consult Bogard's conditions of supervision because he saw no need to—he believed the standard conditions of probation (a search condition being among them) applied to everyone.  He also testified that in eight years as a probation officer, he had never encountered a probationer that was not subject to any conditions of supervision. Despite the reasonableness of this mistake, when Officer Gaxiola authorized the search of Bogard's car, he lacked the basis in law to do so.  For this reason, Officer Suazo's subsequent search cannot be upheld as a valid probation search, and the Government's papers do not defend the search on any other exception to the Fourth Amendment's warrant requirement.

12

However, at the hearing, the Government advanced three additional theories as to how the Court might uphold the search or find a valid search condition authorized at law if not in the judgment.  But these arguments were never briefed[3] and so are waived.  *United States v. Rusnak*, 981 F.3d 697, 705 (9th Cir. 2020) ("An argument is waived where it is known to [a party] and intentionally not pursued."); *James v. Ryan*, 679 F.3d 780, 804 (9th Cir. 2012) *overruled on other grounds by* 568 U.S. 1224 (2013) ("When a party raises a distinct argument for the first time at oral argument . . . not having briefed it at all, we normally consider that argument waived.").  Even if the Court were to entertain an argument that the standard conditions of supervision applied to Bogard by operation of law—either in the interplay between a statute and an administrative rule or simultaneously operational judgments—the Court would be suspect of such too-clever theories as violative of Bogard's right to due process.  *See United States v. Dane*, 570 F.2d

---

[3] At the hearing, the Government presented the Court and defense counsel with a binder of additional statutes and case law, and asserted it had three new arguments to uphold the search. The Government contends that this issue only came to light in Bogard's reply, but this is not the case.  Although Bogard's argument did not emphasize this particular theory over his other challenges to the search—and in fact, may have inadvertently minimized the significance of this argument as it was raised only in a footnote—his opening papers adequately put the Government on notice of this challenge.  The Government was aware of this theory because it briefly addressed the issue in its response brief, stating that the "conditions that are applicable here are the standard conditions that apply to every suspended sentence."  (Doc. 23 at 5 n.1.)  That the Government did not realize the *significance* of Bogard's argument until his reply brief is not adequate grounds to get around the waiver issue.  If the Government wanted to preserve this issue or felt that the manner in which Bogard raised the issue prejudiced it, the Government ought to have requested permission to file a sur-reply.  Surprising the Court and defense counsel with three new theories (and a binder in support) during a hearing is not an adequate way to present an argument.

840, 843 (9th Cir. 1977) ("It is an essential component of due process that individuals be given fair warning of those acts which may lead to a loss of liberty.").  The search of Bogard's vehicle was not a valid probation search, and therefore violated his Fourth Amendment right to be free from unreasonable search and seizure.  All evidence seized in the search is suppressed.

## II.    Bogard's incriminating statements were obtained in violation of Miranda.

Bogard moves to suppress any statements made at the hospital about the gun.  (Doc. 18 at 7.)  He argues that these statements were obtained in violation of *Miranda*, and he had heightened privacy interests that were violated by Officer Potter's questions to him in a hospital setting.  (Docs. 18 at 7; 19 at 4–6.)  Because the Court agrees there was a *Miranda* violation it need not address Bogard's secondary argument.

Turning to the *Miranda* issue, the Government does not dispute that Bogard was in custody but asserts that he was never interrogated.  The Government contends that Bogard's statements were made "freely and not in response to law enforcement questioning."  (Doc. 23 at 7.)  At the hearing, however, the Government conceded that some of Bogard's statements were, in fact, made in response to Officer Potter's questions—and that some of her questions could illicit an incriminating response—in other words, a violation of *Miranda*.  The Government does not, however, locate where it believes a violation may have

occurred.  Curiously, the Government proceeds to argue that the *Miranda* rule does not apply because Bogard's statements were voluntary.[4]  To the extent the Court finds a *Miranda* violation, the Government seems to suggest the Court should parse Bogard's comments statement-by-statement and suppress only some of them, but it fails to provide support for its contention that statements obtained after a *Miranda* violation are admissible on an ad hoc basis.[5]

Given that the parties appear to agree that *Miranda* was violated at some point during Bogard's time at the hospital, the task for the Court is to determine where the violation first occurred.  The Court will then address whether any subsequent unprompted confessional statements may be admitted.

*Miranda* requires that a suspect subject to a custodial interrogation be giving a specific warning designed to notify the suspect of his or her Fifth

---

[4] The Court wonders whether the Government means to argue that Bogard's statements about the gun were "volunteered" rather than "voluntary."  Once *Miranda* applies, the *Miranda* rule supplants the otherwise typical voluntariness analysis that would determine when, under the Fifth Amendment, a defendant's confession must be suppressed as the product of coercion. *Dickerson v. United States*, 530 U.S. 428, 433 (2000); *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985).  While the voluntariness of a statement made after a *Miranda* violation is not irrelevant *where a belated Miranda warning is eventually given*, *Elstad*, 470 U.S. at 309, that inquiry *is* irrelevant here because Bogard made no incriminating statements after Officer Harvey mirandized him.  Indeed, Bogard immediately invoked his rights and declined to talk.  The Court will assume then the Government means to argue that Bogard's volunteered and unprompted admissions made after a *Miranda* violation are admissible.

[5] At the hearing, the Government apologized for failing to cite any law in support of its argument.  The lack of legal support and short-shrift given to this issue has left the Court largely guessing at the contours of the Government's argument.  The Court has done its best to generously construe and address what it understands to be the Government's position.  Any arguments not directly addressed are deemed waived.

Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 495–96 (1966). An officer's failure to give a *Miranda* warning where one is required results in the suppression of "any [subsequent] statements" in the prosecution's case-in-chief. *Id.* at 476–77. Interrogation is (1) express questioning or (2) its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Statements or observations constitute an interrogation when "the police should know [the statement is] reasonably likely to elicit an incriminating response." *Id.* at 301. This inquiry is context specific. *United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017). "Although courts focus primarily on the perceptions of the suspect in determining whether police action is reasonably likely to elicit an incriminating response, the intent of police is not irrelevant." *United States v. Thierman*, 678 F.2d 1331, 1335 (9th Cir. 1982) (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981)). An officer cannot be held accountable for the "unforeseeable results of their words or actions." *Id.* (quoting *Innis*, 446 U.S. at 301–02).

Even in a custodial setting, a volunteered spontaneous admission falls outside of the scope of *Miranda*'s rule because such statements are not prompted by interrogation. *Miranda*, 384 U.S. at 478; *see, e.g.*, *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) (defendant's pre-mirandized incriminating statement in custodial setting not subject to suppression because it

16

was "wholly unrelated" to officer's questioning about immigration status and
therefore "volunteered").  Likewise, an officer's neutral follow-up question in
response to a volunteered admission—such as a question that attempts only to
clarify what has already been said—does not result in a *Miranda* violation.  *See,
e.g.*, *United States v. Cash*, 733 F.3d 1264, 1278 (10th Cir. 2013) (officer's "follow
up question" was not an interrogation because his asking "[w]hat's the deal?" "was
simply an attempt to clarify [the defendant's] dramatic statement about threats to
kill him."); *Tolliver v. Sheets*, 594 F.3d 900, 921 (6th Cir. 2010) (officer's follow-
up question of whether the defendant had more than one gun was not an
interrogation because it was in response to defendant's volunteered admission
about "the other gun").  But where a follow-up question goes beyond the scope of
the original statement or seeks to expand on the defendant's admission, an officer
has begun an interrogation.  *See id.*

Finally, "a *Miranda* warning need not be given when 'police officers ask
questions reasonably prompted by a concern for the public safety.'"  *Allen v. Roe*,
305 F.3d 1046, 1050 (9th Cir. 2002) (quoting *New York v. Quarles*, 467 U.S. 649,
656 (1984)).  Although the public safety exception primarily contemplates the
safety of the officer and the community, courts have recognized the exception
where an officer asks questions necessary to protect the defendant's safety—
particularly in the context of a drug overdose.  *Barnes v. State*, 174 P.3d 732, 738–

39 (Wyo. 2008); *People v. Chatman*, 71 Cal. Rptr. 2d 867, 870 (Cal. Ct. App. 1998); *Benson v. State*, 698 So. 2d 333, 337–38 (Fla. Dist. Ct. App. 1997) ("[T]he right to remain silent would be of little practical value to a defendant who becomes comatose from a drug overdose while being read his *Miranda* rights."); *People v. Stevenson*, 59 Cal. Rptr. 2d 878 (Cal. Ct. App. 1996) ("The *Miranda* advisement was meant to protect an accused from the loss of his right to silence, not from the loss of his life.").

Given the Government's recognition that there is likely a *Miranda* violation somewhere in the mix, the task for the Court is to determine where. Bogard does not ask the Court to suppress any statements prior to the hospital so the Court will begin its inquiry there.

The first incriminating questions the officers posed to Bogard concerned his drug use. Officer Kamerer asked Bogard "whether he had taken anything," and, similarly, Officer Potter asked him whether the meth he ingested was "different from what was found in the foil," in an attempt to ascertain whether Bogard had correctly accounted for all of his recent meth consumption. Both questions were directed towards Bogard's treatment after it became apparent he was overdosing, and therefore fall within the public safety exception. *Barnes*, 174 P.3d at 738–39. There was no *Miranda* violation here.

18

The next question asked by Officer Potter is whether Bogard had a gun. This question does not fall within the public safety exception because, when asked, Bogard was handcuffed to the bed and Officer Potter could not reasonably have believed Bogard posed any imminent threat to herself or anyone else in his condition.  Nevertheless, Officer Potter's question was made in response to Bogard's unprompted statement that he was "going to shoot [the police]."  The Court construes Officer Potter's knee-jerk reaction to Bogard's "volunteered admission" as a neutral follow-up question intended only to clarify what Bogard had already said.  *Tolliver*, 594 F.3d at 921.  Asking Bogard whether he had a gun assumes only a "yes" or "no" answer, and therefore does not contemplate an admission beyond the scope of Bogard's own statement.  *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (recognizing that a question soliciting only a "yes" or "no" is less likely to be interrogational).

After Bogard responded that he did not have a gun, Officer Potter's next question—"what were you going to shoot us with then?"—is similarly an attempt to understand what Bogard had said.  This question was motivated only by confusion.

The *Miranda* violation does not arise until Officer Kamerer informed them that the search of Bogard's vehicle had uncovered a stolen gun.  It does not matter that Officer Kamerer does not punctuate his comment with a question mark if he

knows the statement is reasonably likely to elicit an incriminating response. *United States v. Bentley*, 30 F.3d 140, *3 (9th Cir. 1994) (unpublished).  Nor does it matter that his statement was not directed solely at Bogard.  At the hearing, Officer Potter testified that she understood the comment to be directed towards both Bogard and herself.  Taken in context, this statement does not merely clarify Bogard's prior admission—it takes his admission one step further by introducing a new incriminating element; Bogard never mentioned anything about a *stolen* gun. Nor does it matter that Bogard was not charged with possession of a stolen firearm. The incriminating response elicited by an officer's statement need not be directly tied to the elements of the crime eventually charged.  *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir. 2016) ("The absence of specific gang-related charges does not mean that questions regarding the gang affiliation of a defendant arrested for a violent crime are not likely to prove incriminating.").

While courts are generally reluctant to find that merely confronting an suspect with evidence of his or her guilt meets the high standard necessary to show a statement is the functional equivalent of an interrogation, *see United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994), it is the context here that makes all of the difference.

Here, the officers knew Bogard was particularly vulnerable—only moments before this exchange they were critically concerned for his safety.  And Bogard

20

had already displayed signs of his trust in them, particularly Officer Potter.  Back in the sally port as his condition was declining, Officer Potter had attempted to help Bogard remove his sweatshirt when he complained of being hot, and it was she who insisted that hospital staff check his vitals.  Officer Potter also acted as Bogard's advocate when she assisted him in communicating about his drug use to the nurse.  Although it did not become clear until later just how "chatty" Bogard would become in his confidence of her, both officers were well aware at this point that Bogard's guard was down.  *United States v. Thierman*, 678 F.2d 1331, 1335 (9th Cir. 1982) (recognizing that "the suspect's peculiar susceptibility to the police appeal and whether the police knew that the respondent was unusually disoriented or upset" are factors a court may consider in determining whether, in context, a statement is reasonably likely to illicit an incriminating response).

Moreover, an officer is on thin ground when asking unwarned follow-up questions in response to a suspect's volunteered custodial admission.  The admission itself is not a green light for the officer to ask or say anything to keep the suspect talking.  While Officer Potter's initial questions did not contemplate any prompt beyond Bogard's initial confession, Officer Kamerer's statement about the stolen firearm did because it was designed to correct Bogard's previous assertion that he did not have a gun on him.  What was the point of correcting Bogard if not to see what he would say in response?  *See, e.g.*, *United States v.*

21

*Padilla*, 387 F.3d 1087, 1093 (9th Cir. 2004) (a statement is interrogational if its purpose is to elicit a response). Although Officer Kamerer cannot be held accountable for the unforeseen consequences of his statement, it was certainly foreseeable here that, when confronted with evidence of a crime, Bogard would admit to possessing a stolen gun. Indeed, Bogard did so. He tacitly acknowledged the firearm by asking Officer Kamerer how the officers knew it was stolen.

Taken in context, Officer Kamerer's statement that officers had found a stolen gun in Bogard's vehicle constitutes an interrogation because it is the functional equivalent of a question designed to illicit an incriminating response. Having found a *Miranda* violation, the Court will suppress Bogard's response.

The question now becomes whether, in light of the violation, the Court must suppress all subsequent statements or whether the Government is correct that the Court may admit a subsequent volunteered admission. Significantly here, Bogard later makes an unprompted statement to Officers Harvey and Potter that after the crash he intended to grab his pistol and start shooting. The Government offers no authority for its belief that this statement ought to be admitted, and the Court has found nothing to convince it that the Government is correct.

Although there are significant limitations to the reach of *Miranda* where an initial statement is not otherwise the product of coercion, *see United States v. Patane*, 542 U.S. 630 (2004); *Elstad*, 470 U.S. 298; *Michigan v. Tucker*, 417 U.S.

433 (1974), the Court can find no law to suggest that a subsequent unwarned

statement made in the same custodial setting, close-in-time to the initial *Miranda*

violation, where no *Miranda* warning has yet been given is admissible.  Rather,

*United States v. Bayer*, 331 U.S. 532 (1947), strongly suggests the inverse is true.

In addressing whether a second confession is fruit of the first, the *Bayer* Court

wrote:

> after an accused has once let the cat out of the bag by confessing, no
> matter what the inducement, he is never thereafter free of the
> psychological and practical disadvantages of having confessed. He can
> never get the cat back in the bag. The secret is out for good. In such a
> sense, a later confession always may be looked upon as fruit of the first.

*Id.* at 540.  Although, there the Court ultimately allowed the admission of the

second confession, it did so on facts that are readily distinguishable.  In *Bayer*, the

second confession was made six months after the first and the defendant was given

fair warning that his statements could be used against him.  *Id.*

Accordingly, the Court will suppress the entirety of the exchange between

Bogard and officers at the hospital following the *Miranda* violation.

IT IS ORDERED that Bogard's motion (Doc. 18) is GRANTED.  The

evidence obtained in the February 8, 2020 search of Bogard's vehicle and his

statements at the hospital are suppressed consistent with this order.

IT IS FURTHER ORDERED that the Government shall file a notice on or before April 9, 2021 of its intent to proceed to trial, dismiss the indictment, or pursue an appeal.[6]

DATED this 5th day of April, 2021.

Dana L. Christensen, District Judge
United States District Court

---

[6] The Government need not commit to an appeal at this time.  The Court simply needs to know whether to issue a subsequent scheduling order for purposes of the speedy trial clock.